Kenneth R. **LOTTINGER**, Plaintiff,

v.

**SHELL OIL COMPANY and Shell Oil Products Company, Defendants.**

**No. CIV. A. H–99–2103.**

United States District Court, S.D. Texas, Houston Division.

May 16, 2001.

John Hooshik Kim, Gallagher Young et al., Houston, TX, for Kenneth R Lottinger, plaintiffs.

L Christopher Butler, Shell Oil Company, Houston, TX, for Shell Oil Company, Shell Oil Products Company, defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendants Shell Oil Company and Shell Oil Products Company's (collectively "Shell") Motion for Summary Judgment (# 13). Shell seeks summary judgment on Plaintiff Kenneth R. Lottinger's ("Lottinger") claims for disability discrimination under the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code Ann. §§ 21.001–21.128, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12113; his claims for violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–2654, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132; and his common law claim for intentional infliction of emotional distress. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

### I. *Background*

Lottinger was hired by Shell in January 1980 to work in Shell's Retail Marketing Division. While employed by Shell, he held various positions within the company. At the time of his termination, he was a senior administrative representative in the Marketing Real Estate Division.

Lottinger contends that he was diagnosed with depression in 1995 and subsequently began abusing alcohol. According to Lottinger, in March 1996, he began attending Alcoholics Anonymous ("AA") meetings to assist with combating his alcoholism. In June 1996, Lottinger informed Shell that he was abusing alcohol, and Shell arranged for his admission to an outpatient program called "The Right Step," located in downtown Houston. Soon thereafter, he entered The Right Step's residential rehabilitation program after determining that he needed more than outpatient care. While there, Shell's Employee Assistance Program ("EAP") Administrator, Bud Peterson ("Peterson"), visited him to inquire about the status of his recovery. Lottinger remained in inpatient care for approximately thirty days.

Lottinger does not recall the exact date of his release from The Right Step. According to Lottinger, on July 22, 1996, after receiving approximately twenty-four hours' notice, he was called to attend a meeting with Peterson, Claude Hudson ("Hudson"), the head of the Real Estate Division, and Lou Wilson ("Wilson") a representative of the Human Resources Department. During the meeting, Lottinger signed a "return-to-work" agreement that conditioned his continued employment on, among other things, abstention from alco-

hol abuse, verified attendance at three AA meetings per week, and meetings with substance-abuse treatment counselors until July 22, 1997, as well as random drug tests for forty-eight months. The agreement further provided that non-compliance would likely result in his termination. Lottinger claims that, because of his state of mind at the time, he did not fully understand what he was signing and that the document was unduly vague as to how often he was to meet with counselors. He states, however, "At that point I was willing to do anything to keep my job. That's why I signed the letter." The agreement also stated, "Since you self-identified your substance abuse problem and completed a company approved treatment and rehabilitation program, you are permitted a second such self-referral." Lottinger maintains that it was unreasonable for Shell to allow him only one additional self-referral should he experience further problems. He also contends that it was inappropriate to require him to obtain the signatures of AA chairpersons on certificates verifying his attendance at meetings because it made it appear that he was being forced to be there and delayed him from joining fellow AA members directly after the meetings.

Lottinger asserts that two to three days after his return to Shell, his supervisor, Lloyd Logan ("Logan"), informed him that his job title had been changed from coordinator to team leader. He contends that, over time, Logan removed some of his prior duties, added extensive clerical duties to his responsibilities, and ultimately changed his job title to that of a team member. He also complains that, in addition to his regular proposal work, he was required to develop a real estate database, which involved pulling numerous files and entering data on a spreadsheet. There is no indication that his compensation or benefits were ever reduced during the time period at issue. Lottinger also maintains that he was embarrassed by the manner in which the random drug tests were conducted, as he had to leave his department without notice and did not feel that he could explain where he was going to his co-workers. He complains that Shell "could have been a little more flexible about the timing of it as opposed to just 'you have to report now.'"

In August 1996, Lottinger relapsed into alcohol abuse and, after notifying Shell, he was readmitted into The Right Step residential program. Following his release, during a meeting with Hudson and Peterson on September 9, 1996, Lottinger executed another "return-to-work" agreement. He concedes that he read over the agreement and that Hudson and Peterson went over the agreement with him before he signed it.

In May 1997, Lottinger again relapsed into alcohol abuse. He maintains that he became suicidal and that his wife had him admitted into the psychiatric unit at St. Joseph's Hospital in Houston, where he remained for seven days. Lottinger contends that, after being released from the hospital, Peterson gave him the impression that he had been discharged, telling him that he would have to await final word, although there is no indication that Shell stopped paying his salary at that point in time. After two or three weeks at home, he started drinking again and was readmitted into The Right Step residential program for four to five days.

According to Lottinger, Peterson and some counselors at Shell informed him that he was required to remain in a lock-up facility known as "A Better Way" for one year in order to be considered for re-employment. Lottinger states that he checked himself into A Better Way and remained there until June 30, 1997, when

Shell officially terminated his employment. According to Lottinger, during the meeting at which he was terminated, he was first told that the reason for his discharge was that he had failed to attend sufficient AA meetings and did not submit the required paperwork. He contends that when he explained to Hudson and another Human Resources representative that he was, in fact, in compliance with the meeting requirements to the extent possible given his recent hospitalization and that he simply had not had the opportunity to submit his paperwork, the Shell representatives went into the hallway, returned a short time later, and said, "We have decided to fire you because you drank again." Lottinger returned to The Better Way for a few months, and as of June 1, 1999, the date of his deposition, he reported experiencing no further alcohol abuse problems, although alcoholism remained "an ongoing daily battle."

On June 22, 1998, Lottinger filed suit in the 189th Judicial District Court of Harris County, Texas, seeking relief from Shell for disability discrimination under the TCHRA and intentional infliction of emotional distress. On June 25, 1999, he amended his petition to include federal law claims under the ADA, the FMLA, and ERISA. On July 1, 1999, Shell removed the action to federal court. In his amended petition, Lottinger alleges that while employed in the Real Estate Division, he suffered from depression and alcoholism. He further contends that, after giving notice of his alcohol abuse, Shell engaged in retaliatory, harassing, and discriminatory conduct and disparate treatment toward him in an attempt to force him to resign. Lottinger also claims that Shell is liable for intentional infliction of emotional distress because, after the company became aware of his alcohol problem, he was subjected to two reductions in job title, unde-

sirable assignments, criticism, random drug tests, and, ultimately, termination.

On February 15, 2001, Shell filed its motion for summary judgment, asserting that Lottinger is time-barred from bringing his cause of action under the TCHRA because he failed to file a charge of discrimination within 180 days of his dismissal and failed to file the instant lawsuit within sixty days of receipt of his notice of right to sue. Shell also argues that Lottinger is not "disabled" as that term is defined in the TCHRA and the ADA. Shell further asserts that Lottinger can produce no evidence that Shell discriminated against him in violation of the FMLA. Additionally, Shell contends that Lottinger's termination was not a pretext to deny him an ERISA-protected benefit. Finally, Shell maintains that the actions leading to Lottinger's termination did not rise to the level of extreme and outrageous conduct, as necessary for recovery for intentional infliction of emotional distress.

## II. Analysis

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). Where a defendant moves for summary judgment on the basis of an affirmative defense and, thus, bears the ultimate burden of persuasion, "it must adduce evidence to support each element of its defenses and demonstrate the lack of any genuine issue of material fact with regard thereto." *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 505 (5th Cir.1999), *cert. denied,* 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000) (citing *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1074 (5th Cir.), *cert. denied,* 522 U.S. 915, 118 S.Ct. 299, 139 L.Ed.2d 231 (1997)); *see Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving parties, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Colson,* 174 F.3d at 506; *Marshall,* 134

F.3d at 321–22; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348). All the evidence must be construed "in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir. 1993)); *see Reeves,* 530 U.S. at 150, 120 S.Ct. 2097; *Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997), *cert. denied,* 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall,* 134 F.3d at 321. The evidence is construed "in favor of the nonmoving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir.1999); *accord Little,* 37 F.3d at 1075 ("*We do not* ... *in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts* ") (emphasis in original) (citing *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

Furthermore, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.' " *Eastman*

*Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little*, 37 F.3d at 1075; *see Hart*, 127 F.3d at 435; *Wallace*, 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990) (citing *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *Wenner*, 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## B. *Texas Commission on Human Rights Act*

The TCHRA provides:

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

TEX. LAB. CODE ANN. § 21.051. "In enacting the TCHRA, the Legislature intended to correlate state law with federal law in employment discrimination cases." *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex.2000) (citing TEX. LAB. CODE ANN. § 21.001; *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex.1999)); *accord Vielma v. Eureka Co.*, 218 F.3d 458, 462 (5th Cir.2000); *Grogan v. Savings of Am., Inc.*, 118 F.Supp.2d 741, 747 (S.D.Tex.), *aff'd*, 202 F.3d 265 (5th Cir.1999); *Wal–Mart Stores, Inc. v. Lane*, 31 S.W.3d 282, 295 (Tex.App.—Corpus Christi 2000, no pet.); *Fields v. Teamsters Local Union No. 988*, 23 S.W.3d 517, 524 (Tex.App.—Houston [1st Dist.] 2000, no pet.). The statute specifically states that one of its purposes is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (42 U.S.C. Section 2000e *et seq.*)." TEX. LAB. CODE ANN. § 21.001; *see Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 n. 4 (5th Cir.1999); *Grogan*, 118 F.Supp.2d at 747; *NME Hosps., Inc.*, 994 S.W.2d at 144; *Caballero v. Central Power & Light Co.*, 858 S.W.2d 359, 361 (Tex. 1993); *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex.1991).

■ In keeping with the expressed legislative intent, the TCHRA is interpreted in a manner consistent with federal laws prohibiting employment discrimination. *See Daniels v. City of Arlington,* 246 F.3d 500, 507 (5th Cir.2001); *Grogan,* 118 F.Supp.2d at 747; *Willrich,* 28 S.W.3d at 24; *Specialty Retailers, Inc. v. DeMoranville,* 933 S.W.2d 490, 492 (Tex.1996); *Lane,* 31 S.W.3d at 295. Thus, "the same burden-shifting framework used to analyze a case under the federal discrimination statutes applies under the Texas statute." *Grogan,* 118 F.Supp.2d at 747; *accord Talk,* 165 F.3d at 1024 n. 5; *Jenkins v. Guardian Indus. Corp.,* 16 S.W.3d 431, 436–37 (Tex.App.—Waco 2000, no pet.); *see Willrich,* 28 S.W.3d at 24. Indeed, Texas courts considering TCHRA claims have noted that "[b]ecause the TCHRA seeks to promote federal civil rights policy and because Texas has little case law interpreting the TCHRA, it is proper to look to analogous federal precedent." *Fields,* 23 S.W.3d at 524; *accord Specialty Retailers, Inc.,* 933 S.W.2d at 492; *Speer v. Presbyterian Children's Home & Serv. Agency,* 847 S.W.2d 227, 232 (Tex.1993); *Morrison v. Pinkerton Inc.,* 7 S.W.3d 851, 854 (Tex.App.—Houston [1st Dist.] 1999, no pet.).

Therefore, the court analyzes Lottinger's claims under the TCHRA in the same manner it would analyze a similar claim brought under the ADA. *See Zenor v. El Paso Healthcare Sys., Ltd.,* 176 F.3d 847, 852 (5th Cir.1999); *Grogan,* 118 F.Supp.2d at 747; *Deaver v. Texas Commerce Bank,* 886 F.Supp. 578, 585 (E.D.Tex.1995), *aff'd,* 79 F.3d 1143 (5th Cir.1996); *see also Talk,* 165 F.3d at 1024 n. 4; *Willrich,* 28 S.W.3d at 24; *Kiser v. Original, Inc.,* 32 S.W.3d 449, 452 (Tex.App.—Houston [14th Dist.] 2000, no pet.). "The same basic standards and definitions are used under the TCHRA, the ADA, and the Rehabilitation Act." *Morrison,* 7 S.W.3d at 854 n. 4. Thus,

if summary judgment is appropriate on a plaintiff's ADA claims, it is also appropriate on his TCHRA claims. *See Allison v. City of Fort Worth,* 60 F.Supp.2d 589, 593–94 (N.D.Tex.1999) (citing *Patton v. United Parcel Serv., Inc.,* 910 F.Supp. 1250, 1262 (S.D.Tex.1995)).

### 1. *Statute of Limitations*

■ The TCHRA establishes a comprehensive administrative review system for obtaining relief from unlawful employment practices. *See Schroeder,* 813 S.W.2d at 485; *Eckerdt v. Frostex Foods, Inc.,* 802 S.W.2d 70, 71 (Tex.App.—Austin 1990, no writ). Before suing for redress, an employee must exhaust the administrative remedies available under the Act. *See Caballero,* 858 S.W.2d at 360; *Schroeder,* 813 S.W.2d at 486. A person claiming to be aggrieved by an unlawful employment practice must file a complaint with the Texas Commission on Human Rights ("TCHR") within 180 days of the alleged discriminatory act. *See* Tex. Lab. Code Ann. § 21.202(a) ("A complaint under this subchapter must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred"); *Specialty Retailers, Inc.,* 933 S.W.2d at 492; *Schroeder,* 813 S.W.2d at 486; *Wal–Mart Stores, Inc. v. Davis,* 979 S.W.2d 30, 41 (Tex.App.—Austin 1998, no pet.); *O'Bryant v. City of Midland,* 949 S.W.2d 406, 417 (Tex.App.—Austin 1997), *aff'd in part & rev'd in part on other grounds,* 18 S.W.3d 209 (Tex.2000); *Vincent v. West Tex. State Univ.,* 895 S.W.2d 469, 473 (Tex.App.—Amarillo 1995, no writ); *Eckerdt,* 802 S.W.2d at 71. These requirements ensure that "the Commission [has an] opportunity to investigate the allegations, informally eliminate any discrimination, and minimize costly litigation." *Vincent,* 895 S.W.2d at 473. The time limit for filing a complaint with the Commission is manda-

tory and jurisdictional. *See Specialty Retailers, Inc.*, 933 S.W.2d at 492; *Schroeder*, 813 S.W.2d at 488; *O'Bryant*, 949 S.W.2d at 417; *Vincent*, 895 S.W.2d at 473. State law claims of employment discrimination are time-barred when filed after the 180–day period, while the same claims brought under federal law would be timely if filed within 300 days of the alleged discriminatory conduct. *See Pope v. MCI Telecomms. Corp.*, 937 F.2d 258, 263–64 (5th Cir.1991), *cert. denied*, 504 U.S. 916, 112 S.Ct. 1956, 118 L.Ed.2d 558 (1992).

■ If the Commission dismisses the complaint or has not filed suit or negotiated a conciliation agreement within 180 days after the filing of the complaint, it must notify the complainant in writing. *See* TEX. LAB. CODE ANN. § 21.208; *Schroeder*, 813 S.W.2d at 486; *Eckerdt*, 802 S.W.2d at 71. The complainant may request from the Commission a written notice of right to file a civil action. *See Schroeder*, 813 S.W.2d at 486; TEX. LAB. CODE ANN. § 21.252. Nevertheless, the "[f]ailure to issue the notice of a complainant's right to file a civil action does not affect the complainant's right ... to bring a civil action against the respondent." *Id.* at § 21.252(d); *Eckerdt*, 802 S.W.2d at 71; *Green v. Aluminum Co. of Am.*, 760 S.W.2d 378, 380 (Tex.App.—Austin 1988, no writ). Within sixty days of receiving the notice of right to sue, the complainant may bring suit against the party named in the complaint. *See Schroeder*, 813 S.W.2d at 486; *Eckerdt*, 802 S.W.2d at 71; TEX. LAB. CODE ANN. § 21.254 ("Within 60 days after the date a notice of the right to file a civil action is received, the complainant may bring a civil action against the respondent"). Although the sixty-day period is not considered jurisdictional under Texas law, actions filed in federal court after the expiration of sixty days are routinely dismissed as untimely. *See Eckerdt*, 802

S.W.2d at 71; *see, e.g., Dean v. Xerox Corp.*, No. Civ. A. 3:96–CV–2409–D, 1997 WL 756574, at *2 (N.D.Tex. Nov.25, 1997); *Battee v. Eckerd Drugs, Inc.*, No. 396CV1551–R, 1997 WL 340941, at *10 (N.D.Tex. June 13, 1997); *Zevator v. Methodist Hosp.*, No. H–94–859, 1995 WL 500637, at *2 (S.D.Tex. Mar.30, 1995). An EEOC right-to-sue notice is not interchangeable with a TCHR "right to file a civil action" letter; thus, receipt of an EEOC ninety-day letter does not trigger the analogous TCHR sixty-day filing period. *See Jones v. Grinnell Corp.*, 235 F.3d 972, 975 (5th Cir.2001); *Vielma*, 218 F.3d at 464–65.

■ In any event, a civil action must be brought within two years after the filing of the complaint with the Commission. *See* TEX. LAB. CODE ANN. § 21.256 ("A civil action may not be brought under this subchapter later than the second anniversary of the date the complaint relating to the action is filed"). Like the 180–day requirement, the limitations period for filing suit is mandatory and jurisdictional. *See Dean*, 1997 WL 756574, at *2; *Central Power & Light Co. v. Caballero*, 872 S.W.2d 6, 7 (Tex.App.—San Antonio 1994, writ denied); *Eckerdt*, 802 S.W.2d at 71; *Green*, 760 S.W.2d at 380. Moreover, the Commission's failure to send the notice of right to sue on a timely basis does not excuse the mandatory filing requirement or toll the running of limitations. *See Eckerdt*, 802 S.W.2d at 71; *Green*, 760 S.W.2d at 380.

■ In the case at bar, Lottinger filed his charge of discrimination with the EEOC on March 12, 1998, the EEOC sent him a right-to-sue notice on March 27, 1998, the TCHR sent him a notice of right to file a civil action on April 24, 1998, and Lottinger filed his Original Petition in state court on June 22, 1998. Although Lottinger filed suit within sixty days of

receipt of the TCHR notice of right to sue, his initial charge of discrimination was untimely, as it was filed 255 days after the date of his termination—June 30, 1997, far in excess of the required 180–day period.

Lottinger argues that he is in compliance with the 180–day requirement because he first contacted the EEOC in November or December 1997, prior to the expiration of the 180–day period, which occurred on or about December 24, 1997. At deposition, Lottinger stated that, while he did not file his charge until March 12, 1998, he "filed forms" and "signed several forms [with the EEOC] between November and December [1997]." He also submits an EEOC Intake Record, dated February 6, 1998, containing information such as Lottinger's and Shell's addresses and telephone numbers, which reflects that Lottinger inquired at the EEOC on December 5, 1997, stating simply, "INQUIRY DATE: 120597." Neither this document nor Lottinger's deposition reveals the specific nature or contents of the inquiry. While Lottinger testified at deposition that he could locate copies of other documents he filed with the EEOC, he has submitted no documentation other than the Intake Record and his subsequent charge.

Lottinger relies on a 1992 Texas Court of Appeals case to support his claim that he timely filed his charge. *See Brammer v. Martinaire, Inc.*, 838 S.W.2d 844, 846–47 (Tex.App.—Amarillo 1992, no writ). In that case, the alleged discrimination took place on January 12, 1989, and the plaintiff filed an unverified questionnaire with the TCHR on April 24, 1989, followed by a verified complaint on September 1, 1989. *See id.* at 845. Relying on § 327.1(g) of the Texas Administrative Code, which allows complaints filed with the TCHR to be amended to cure technical defects or omissions, the court held that the filing of the unverified questionnaire within 180 days of the alleged violation satisfied the statute because the subsequent verified complaint related back to the date of the unverified questionnaire, curing any earlier technical defects. *See id.* at 845–47.

Here, Lottinger has produced no documentation, such as a questionnaire or other similar form, that could reasonably be interpreted as an unverified questionnaire or complaint submitted to the EEOC. At deposition, he maintained that he inquired more than once at the EEOC, but he did not assert that he completed a questionnaire or filed a charge of discrimination prior to March 12, 1998. The Intake Record does not, contrary to Lottinger's assertion, reveal that he did anything other than make an inquiry. Hence, *Brammer* is inapposite and does not support his position. Therefore, Lottinger is barred from asserting claims under the TCHRA due to his failure to file a charge of discrimination within 180 days of his termination.

### 2. *Scope of Judicial Complaint*

█ It is well settled that courts are without jurisdiction to consider claims brought under the TCHRA as to which an aggrieved party has not first exhausted his administrative remedies by filing a charge of discrimination with the TCHR or EEOC. *See Jones,* 235 F.3d at 973–74 & n. 1; *Caballero,* 858 S.W.2d at 360; *Schroeder,* 813 S.W.2d at 486; *see also Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995); *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 711 (5th Cir. 1994); *Clark v. Kraft Foods, Inc.,* 18 F.3d 1278, 1279 (5th Cir.1994); *Tolbert v. United States,* 916 F.2d 245, 247–48 (5th Cir. 1990). As with complaints filed under Title VII, civil complaints filed under the TCHRA may only encompass "discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the

case before the Commission." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970); *see Haynes v. BlueCross & Blueshield of Tex., Inc.*, No. Civ. A. 3:97–CV–2881–R, 2000 WL 140744, at *6 (N.D.Tex. Feb.4, 2000); *Martineau v. Arco Chem. Co.*, No. H–98–1608, 1998 WL 1173513, at *10 (S.D.Tex. Dec.24, 1998), *aff'd*, 203 F.3d 904 (5th Cir.2000); *Dean*, 1997 WL 756574, at *3; *Elgaghil v. Tarrant County Junior College*, No. 2–99–133–CV, 2000 WL 1459805, at *5 (Tex. App.—Fort Worth Sept.28, 2000, no pet.); *see also Dollis*, 77 F.3d at 781; *National Ass'n of Gov't Employees*, 40 F.3d at 711; *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir.1993); *Young v. City of Houston*, 906 F.2d 177, 179 (5th Cir.1990). Thus, a judicial complaint is limited by the claims in the charge and the " ' "scope" of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' " *Haynes*, 2000 WL 140744, at *6 (quoting *Sanchez*, 431 F.2d at 466). Hence, the failure to assert a claim of discrimination in an EEOC/TCHR charge and/or its lack of development in the course of a reasonable investigation of that charge precludes the claim from later being brought in a civil suit. *See Thomas v. Texas Dep't of Crim. Justice*, 220 F.3d 389, 395 (5th Cir.2000); *National Ass'n of Gov't Employees*, 40 F.3d at 711–12; *Young*, 906 F.2d at 179; *Sanchez*, 431 F.2d at 465–66; *Dean*, 1997 WL 756574, at *3.

■ Lottinger's charge reads:

I. On or about June 30, 1997, I was discharged from the position of Senior Administrative Representative. Respondent is a[sic] oil company.

II. On or about June 30, 1997, Claude Hudson, informed me that my dismissal is due to alcohol problem [sic].

III. I believe I was discriminated against because of my disability, in viola-

tion of the Americans With Disabilities Act of 1990, as amended.

Lottinger does not mention or even allude to depression in his charge. Nevertheless, the record reflects that his current claim of depression is related to the alleged alcohol problem set forth in the charge. According to Lottinger, his physicians advised him that his alcohol abuse probably developed as a means of self-medicating the pain caused by his depression. Thus, although there is no indication that the EEOC or the TCHR actually investigated his complaint, a reasonable investigation of the charge would likely have revealed his prior alleged diagnosis of depression. Therefore, viewing the evidence in the light most favorable to the plaintiff, the allegations in Lottinger's EEOC charge were sufficient to preserve his claims of disability discrimination under the TCHRA based on both depression and alcoholism.

### 3. *Existence of a Disability under the TCHRA*

■ Assuming that Lottinger had timely filed his charge, he still could not succeed under the TCHRA on his claim of disability discrimination based on alcoholism because the Act expressly excludes alcohol abuse from the definition of disability. Although it is not entirely clear from the record, in his response to the motion for summary judgment, Lottinger asserts that he is not claiming disability discrimination under the TCHRA on the basis of his alcoholism but, rather, on the basis of his depression. This is no doubt due to the explicit language of the TCHRA, which provides:

"Disability" means, with respect to an individual, a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being

regarded as having such an impairment. *The term does not include:*

> (A) a current condition of addiction to the use of alcohol, a drug, an illegal substance, or a federally controlled substance.

TEX. LAB. CODE ANN. § 21.002(6) (emphasis added). It is undisputed that during the relevant time period, Lottinger was alcohol dependent. Hence, he does not qualify as a disabled individual within the meaning of the TCHRA on the basis of his alcoholism. Therefore, to the extent Lottinger is asserting a disability discrimination claim based on alcoholism, his claim is not cognizable under the TCHRA.

His claim under the TCHRA based on depression must be rejected, as well. As discussed *infra*, summary judgment is warranted on Lottinger's claim of disability discrimination under the ADA, which is based on both alcoholism and depression. Because the same standards apply, summary judgment is also proper as to his parallel claims under the TCHRA.

#### C. *Americans with Disabilities Act*

Lottinger argues that Shell discriminated against him in violation of federal law on the basis of two disabilities—alcoholism and depression. The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to individuals without a disability. *See* 42 U.S.C. §§ 12101–12113; 29 C.F.R. § 1630, App.; *Ivy v. Jones,* 192 F.3d 514, 516 (5th Cir.1999); *Seaman v. CSPH, Inc.,* 179 F.3d 297, 300 (5th Cir. 1999); *Burch v. Coca–Cola Co.,* 119 F.3d 305, 313 (5th Cir.1997), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 804 (5th Cir.1997), *cert. denied,* 522 U.S. 1115, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998); *Taylor v. Principal Fin. Group,* 93 F.3d 155, 161 (5th Cir.), *cert. denied,* 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996).

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 801, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). "The ADA prohibits discrimination on the basis of disability 'to ensure that [such] individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others.'" *Deas v. River West, L.P.,* 152 F.3d 471, 482 (5th Cir.1998), *cert. denied,* 527 U.S. 1035, 119 S.Ct. 2392, 144 L.Ed.2d 793 (1999) (quoting *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)).

The ADA contains four codified titles: Employment (Title I), Public Services (Title II), Public Accommodations and Services Operated by Private Entities (Title III), and Miscellaneous Provisions (Title IV). Under Title I, which covers employment discrimination, the Act provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 560 n. 7, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999); *Cleveland,* 526 U.S. at 801, 119 S.Ct. 1597; *Seaman,* 179 F.3d at 300; *Coolbaugh v. Louisiana,* 136 F.3d 430, 438 n. 5 (5th Cir.), *cert. denied,* 525 U.S. 819,

119 S.Ct. 58, 142 L.Ed.2d 45 (1998); *Foreman,* 117 F.3d at 804–05; *Taylor,* 93 F.3d at 162; *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995). Employees asserting claims under Title I of the ADA are required to follow the procedures applicable to Title VII actions. *See* 42 U.S.C. § 12117(a); *Zimmerman,* 170 F.3d at 1172; *Wagner v. Texas A & M Univ.,* 939 F.Supp. 1297, 1307 (S.D.Tex. 1996); *Stafford v. Radford Cmty. Hosp., Inc.,* 908 F.Supp. 1369, 1374 (W.D.Va. 1995).

### 1. *Prima Facie Case and Burden of Proof*

To recover under the ADA, the plaintiff must prove that he was discriminated against on the basis of his disability. *See Kapche v. City of San Antonio,* 176 F.3d 840, 842 (5th Cir.1999); *Gonzales v. City of New Braunfels,* 176 F.3d 834, 836 (5th Cir.1999); *Talk,* 165 F.3d at 1024; *Hamilton v. Southwestern Bell Tel. Co.,* 136 F.3d 1047, 1052 (5th Cir.1998); *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1092 (5th Cir.1996); *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 36 (5th Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997). The plaintiff may present either direct evidence of disability discrimination or employ an indirect method of proof utilized in other types of employment discrimination cases. *See Seaman,* 179 F.3d at 300; *Taylor,* 93 F.3d at 162; *Rizzo v. Children's World Learning Ctrs. Inc.,* 84 F.3d 758, 762 (5th Cir.1996); *Daigle,* 70 F.3d at 396; *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the absence of direct evidence of discrimination, the plaintiff can establish a *prima facie* case under the ADA by showing that:

(1) he has a "disability;"

(2) he is qualified for the job;

(3) he was subject to an adverse employment action; and

(4) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees.

*See Seaman,* 179 F.3d at 300; *Burch,* 119 F.3d at 320; *Daigle,* 70 F.3d at 396; *see also Ivy,* 192 F.3d at 516; *Talk,* 165 F.3d at 1024; *Turco,* 101 F.3d at 1092.

If the plaintiff succeeds in making this *prima facie* showing, a rebuttable presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Daigle,* 70 F.3d at 396 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *Olitsky v. Spencer Gifts, Inc.,* 964 F.2d 1471, 1478 n. 19 (5th Cir.1992), *cert. denied,* 507 U.S. 909, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993); *EEOC v. Texas Bus Lines,* 923 F.Supp. 965, 969–70 (S.D.Tex. 1996). While the employer need not prove that its actions were motivated by the legitimate reason, it must produce some evidence in support of its proffered rationale. *See Daigle,* 70 F.3d at 396 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–10, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *Texas Bus Lines,* 923 F.Supp. at 970. The defendant's burden is merely one of production and not of persuasion. *See Burdine,* 450 U.S. at 257–58, 101 S.Ct. 1089. "If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle,* 70 F.3d at 396 (quoting *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742); *see Texas Bus Lines,* 923 F.Supp. at 970.

If the employer meets its burden of production, the presumption is dissolved, and the burden shifts back to the plaintiff

to demonstrate that the proffered reason is a pretext for discrimination—the defendant's alleged nondiscriminatory reason is false and the real reason for the adverse action is disability discrimination. *See Daigle,* 70 F.3d at 396; *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 148 (5th Cir.1995), *cert. denied,* 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996) (citing *Hicks,* 509 U.S. at 510–11, 113 S.Ct. 2742). As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability. *See Seaman,* 179 F.3d at 300; *Daigle,* 70 F.3d at 396 (citing *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742). To prevail on an ADA claim, the plaintiff must prove that an adverse employment decision was made "solely because of his disability." *Gonzales,* 176 F.3d at 836; *Still v. Freeport–McMoran, Inc.,* 120 F.3d 50, 51–52 (5th Cir.1997); *Turco,* 101 F.3d at 1092; *Rizzo,* 84 F.3d at 763. The ADA does not prohibit adverse action due to a consequence of a disability, such as being unable to report to work regularly or to perform essential job duties as a result of an injury or illness. *See Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195–96 (7th Cir.1997); *Rogers v. International Marine Terminals,* 87 F.3d 755, 759–60 (5th Cir.1996). Thus, the ADA does not insulate an employee from adverse action taken by an employer because of misconduct in the workplace, even if his improper behavior is arguably attributable to an impairment. *See Hamilton,* 136 F.3d at 1052; *Burch,* 119 F.3d at 319 n. 14. In short, an employee "can not hide behind the ADA and avoid accountability for his actions." *Hamilton,* 136 F.3d at 1052.

In the case at bar, Shell does not contest that Lottinger was qualified for the job. In addition, his termination was clearly an adverse employment action. None of the other actions about which he complains, however, including changes in job title and in responsibilities (without an accompanying change in salary or benefits), the necessity of sometimes working on evenings and on Saturdays, and being instructed to post for a new position because the budget for his current position had been eliminated (without actually changing positions) qualify as adverse employment actions. *See Watts v. Kroger Co.,* 147 F.3d 460, 466 (5th Cir.1998) (change in work schedule and being asked to perform tasks not previously assigned are not adverse employment actions); *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (reassignment to different division is not adverse employment action); *Yates v. Avco Corp.* 819 F.2d 630, 638 (6th Cir.1987) (transfer without reduction in pay or benefits does not constitute adverse action). Shell asserts that Lottinger cannot succeed on his ADA termination claim, however, because he did not suffer from a qualifying disability.

### 2. Existence of a Disability under the ADA

The threshold requirement in any case brought under the ADA is a showing that the plaintiff suffers from a disability protected under the Act. *See Hamilton,* 136 F.3d at 1050; *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1119 (5th Cir. 1998); *Rogers,* 87 F.3d at 758. "[W]hether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *see Ivy*, 192 F.3d at 516; *Talk*, 165 F.3d at 1021; *Deas*, 152 F.3d at 475; *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir.1998); *Hamilton*, 136 F.3d at 1050; *Sherrod*, 132 F.3d at 1119; *Still*, 120 F.3d at 52; *Robinson*, 101 F.3d at 36. The ADA further restricts the meaning of physical and mental impairment to:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h)(1), (2); *see Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 n. 5 (5th Cir.1995). "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities." *Id.* at 726; *accord Deas*, 152 F.3d at 479.

### a. *Impairment Substantially Limiting a Major Life Activity*

The ADA defines neither "substantially limits" nor "major life activities," but the EEOC's regulations under the ADA, which adopt the same definition of major life activities as used in the Rehabilitation Act, provide significant guidance. *See Dutcher*, 53 F.3d at 726; *see also Talk*, 165 F.3d at 1024; *Hamilton*, 136 F.3d at 1050; *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir.1994), *cert. denied*, 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995); *Chandler v. City of Dallas*, 2 F.3d 1385, 1391 (5th Cir.1993), *cert. denied*, 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). " 'Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " *Talk*, 165 F.3d at 1024–25; *Hamilton*, 136 F.3d at 1050 (quoting 29 C.F.R. § 1630.2(i)); *Dutcher*, 53 F.3d at 726; *Bolton*, 36 F.3d at 942; *Chandler*, 2 F.3d at 1390. " 'The statutory language, requiring a substantial limitation of a major life activity, emphasizes that the impairment must be a significant one.' " *Deas*, 152 F.3d at 479 (quoting *Forrisi v. Bowen*, 794 F.2d 931, 933–34 (4th Cir.1986)). A "fundamental statutory requirement" is that "only impairments causing 'substantial limitat[ions] in individuals' ability to perform major life activities constitute disabilities." *Kirkingburg*, 527 U.S. at 565, 119 S.Ct. 2162.

The factors to be considered in determining whether an impairment substantially limits a major activity include:

(1) the nature and severity of the impairment;

(2) its duration or expected duration; and

(3) its permanent or expected permanent or long-term impact.

*See Pryor*, 138 F.3d at 1026 (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)); *Hamilton*, 136 F.3d at 1050; *Oswalt v. Sara Lee Corp.*, 74 F.3d 91, 92 (5th Cir.1996); *Dutcher*, 53 F.3d at 726; *Bolton*, 36 F.3d at 943; *see also Deas*, 152 F.3d at 480. " '[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.' " *Pryor*, 138 F.3d at 1026 (quoting 29 C.F.R. § 1630, App., § 1630.2(j)); *see Hamilton*, 136 F.3d at 1051; *Rogers*, 87 F.3d at 759. Further-

more, when determining whether an individual is substantially limited in a major life activity, corrective and mitigating measures, such as medication and assisting devices, must be taken into account. *See Sutton,* 527 U.S. at 482, 119 S.Ct. 2139; *Cooper v. Olin Corp.,* 246 F.3d 1083, 1087–88 (8th Cir.2001); *Cash v. Smith,* 231 F.3d 1301, 1305 n. 4 (11th Cir.2000); *Ivy,* 192 F.3d at 516; *Spades v. City of Walnut Ridge,* 186 F.3d 897, 900 (8th Cir.1999); *EEOC v. R.J. Gallagher Co.,* 181 F.3d 645, 654 (5th Cir.1999). "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." *Sutton,* 527 U.S. at 482–83, 119 S.Ct. 2139.

The EEOC's regulations define "substantially limited" as meaning:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j)(i), (ii); *see Talk,* 165 F.3d at 1025 n. 6; *Deas,* 152 F.3d at 480; *Pryor,* 138 F.3d at 1026 n. 12; *Hamilton,* 136 F.3d at 1050 n. 5; *Sherrod,* 132 F.3d at 1119; *Dutcher,* 53 F.3d at 726 n. 8. " 'To determine whether a person is substantially limited in a major life activity other than working, we look to whether that person can perform the normal activities of daily living.' " *Pryor,* 138 F.3d at 1027 (quoting *Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.1996)); *accord Sherrod,* 132 F.3d at 1120. Disability status is ascertained on a case-by-case basis, as " '[t]he determination of whether an individual has a disabili-

ty is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.' " *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139 (quoting 29 C.F.R. Pt. 1630.2(j), App.); *accord Kirkingburg,* 527 U.S. at 566, 119 S.Ct. 2162; *see Zenor,* 176 F.3d at 860 (citing *Burch,* 119 F.3d at 315); *Deas,* 152 F.3d at 478. "The particularized inquiry mandated by the ADA centers on substantial limitation of major life activities, not mere impairment." *Ivy,* 192 F.3d at 516 (citing *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139).

While "working" is listed as one of the major life activities, working " 'does not necessarily mean working at a particular job of one's choice.' " *Bridges v. City of Bossier,* 92 F.3d 329, 335 (5th Cir.1996), *cert. denied,* 519 U.S. 1093, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997) (quoting *Bolton,* 36 F.3d at 942); *accord McGuinness v. University of N.M. Sch. of Med.,* 170 F.3d 974, 978 (10th Cir.1998), *cert. denied,* 526 U.S. 1051, 119 S.Ct. 1357, 143 L.Ed.2d 518 (1999); *Deas,* 152 F.3d at 480–81; *Knapp v. Northwestern Univ.,* 101 F.3d 473, 480–81 (7th Cir.1996), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997) (citing *Welsh v. City of Tulsa,* 977 F.2d 1415, 1417 (10th Cir.1992)); *Wooten v. Farmland Foods,* 58 F.3d 382, 385–86 (8th Cir.1995); *Dutcher,* 53 F.3d at 727. "Only if there is no evidence of impairment to the other major life functions is an impairment to working considered." *Talk,* 165 F.3d at 1025 (citing *Hamilton,* 136 F.3d at 1050 (citing *Dutcher,* 53 F.3d at 726 n. 10)); *accord Pryor,* 138 F.3d at 1026 n. 15.

" '[S]ubstantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to

perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Talk,* 165 F.3d at 1025 (quoting 29 C.F.R. § 1630.2(j)(3)(i)); *accord Zenor,* 176 F.3d at 860; *Deas,* 152 F.3d at 481; *Pryor,* 138 F.3d at 1027; *Hamilton,* 136 F.3d at 1051; *Sherrod,* 132 F.3d at 1120; *Still,* 120 F.3d at 52. An employee's "inability to perform one aspect of [his] job while retaining the ability to perform the work in general does not amount to a substantial limitation of the activity of working." *Dutcher,* 53 F.3d at 727 (citing *Chandler,* 2 F.3d at 1392 (citing *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328, 1343 (S.D.Tex.1987), *aff'd,* 863 F.2d 881 (5th Cir.1988))). "'An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one.'" *Sherrod,* 132 F.3d at 1120 (quoting *Chandler,* 2 F.3d at 1392); *see Knapp,* 101 F.3d at 479 (citing *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1249 n. 3 (6th Cir.1985)); *Dutcher,* 53 F.3d at 727.

An ADA claimant must prove that he was disabled at the time of the alleged discriminatory act. *See Cash,* 231 F.3d at 1306 (disability must be evaluated as manifested at the time of the challenged employment action); *McDaniel v. Mississippi Baptist Med. Ctr.,* 877 F.Supp. 321, 326–27 (S.D.Miss.), *aff'd,* 74 F.3d 1238 (5th Cir.1995) (plaintiff must be a "qualified individual with a disability" at the time the adverse action occurred); *see also Kocsis,* 97 F.3d at 884 (plaintiff must establish as part of *prima facie* case that she was a qualified individual with a disability at the time of the discriminatory act). "The legislative history of the ADA reveals that the term 'qualified' refers to whether the individual [was] qualified at the time of the job action in question." *Morton v. GTE North Inc.,* 922 F.Supp. 1169, 1178 (N.D.Tex. 1996), *aff'd,* 114 F.3d 1182 (5th Cir.), *cert.*

*denied,* 522 U.S. 880, 118 S.Ct. 205, 139 L.Ed.2d 141 (1997) (citing S. REP. No. 116, 101st Cong., 1st Sess. 26 (1989)).

■ To meet the first requirement of a *prima facie* case, establishing that he had a disability within the purview of the ADA, Lottinger must show that he had an impairment that was severe enough to substantially limit one or more major life activities. The Fifth Circuit and other courts have declined to find alcoholism to be a *per se* disability under the ADA. *See Burch,* 119 F.3d at 316; *accord Nelson v. Williams Field Servs. Co.,* 216 F.3d 1088, 2000 WL 743684, at *4 (10th Cir. June 9, 2000); *McKey v. Occidental Chem. Corp.,* 956 F.Supp. 1313, 1317 (S.D.Tex.1997). "[A]lcoholism is not a *per se* disability under the ADA, and ... the question of disability, or no disability, based on alcoholism, must be made on a case-by-case basis." *Nelson,* 2000 WL 743684, at *4. "Admittedly, alcoholism is a condition that, if left untreated, can rise to the level of an impairment or even a disability under the ADA. Nowhere in the ADA, however, does it state that an alcoholic is disabled *per se.*" *McKey,* 956 F.Supp. at 1317. Accordingly, "rehabilitated substance abusers, including alcoholics, are not *per se* disabled." *EEOC v. Exxon Corp.,* 124 F.Supp.2d 987, 994 (N.D.Tex.2000). Depression, likewise, is not considered a disability *per se. See Schneiker v. Fortis Ins. Co.,* 200 F.3d 1055, 1061 (7th Cir.2000); *Spades,* 186 F.3d at 899; *Holihan v. Lucky Stores, Inc.,* 87 F.3d 362, 366 n. 3 (9th Cir.1996), *cert. denied,* 520 U.S. 1162, 117 S.Ct. 1349, 137 L.Ed.2d 506 (1997). Thus, to proceed, Lottinger must show that his alcoholism or depression substantially limited a major life activity.

Lottinger contends that he was diagnosed with depression in 1995 by Dr. Woon Sim ("Dr. Sim") at the Kelsey–Sey-

bold Clinic in Houston, who prescribed anti-depressants.[1] He testified that while employed by Shell, he regularly attended therapy under the direction of Dr. Thomas Hamlin ("Dr. Hamlin"), ostensibly for both depression and alcoholism. According to Lottinger, both physicians indicated that his alcohol abuse probably began as a means of self-medicating the pain of his depression. As of the date of his deposition, June 1, 1999, Lottinger remained on antidepressants, saw Dr. Sim every six months to a year, and had been attending AA meetings at least for approximately three years. He stated, however, that he had not attended any therapy sessions since approximately June 1997.

At deposition, Lottinger testified as follows:

Q. How did the depression affect your ability to go about your normal life?

\* \* \* \* \* \*

A. Depression makes it difficult to eat. It makes it difficult to focus on—not normal tasks but on, you know, other tasks. It just—it makes just day-to-day functions difficult.

Q. . . . In what way?

A. If you're not eating, it's kind of hard to have energy to move around.

Q. Well, you didn't stop eating altogether, did you?

A. No.

Q. Did it affect your ability to care for yourself?

A. With the exception of getting decent sleep at night.

Q. So you had trouble sleeping?

A. Absolutely.

Q. Would you get some sleep?

A. Some.

He also stated that he lost a total of forty pounds in three months and that he suffered a loss of self-esteem. When questioned as to whether there was any part of his job he could not perform, Lottinger answered "no," and stated that within two to three weeks of going on anti-depressants in 1995, he "absolutely" could still do his job. He also related that he never told Logan that he could not complete his assignments due to his depression. Hence, while Lottinger may have experienced some trouble sleeping and eating, there is no indication that his sleep and appetite problems were severe, long-term, or had a permanent impact. *See Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 498 (10th Cir.2000); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1302 (10th Cir.), *cert. denied*, 528 U.S. 811, 120 S.Ct. 45, 145 L.Ed.2d 40 (1999). In addition, his use of anti-depressants appeared to alleviate his difficulties. *See Spades*, 186 F.3d at 900. It was only when his medications were changed and he was allegedly taken off anti-depressants "cold turkey" that he became suicidal for a brief period of time, resulting in a one-week hospital stay. Thus, Lottinger's deposition testimony establishes that he was not impaired to the extent that he was

---

**1.** Lottinger does not supply expert testimony supporting the assertion that he suffered from depression, nor does he furnish medical records confirming Dr. Sim's diagnosis. *See Connolly v. Martin*, 230 F.3d 1357, 2000 WL 1478039, at \*1 (6th Cir. Sept.26, 2000). Hence, Lottinger's testimony regarding his purported depression is based entirely on hearsay, which is inadequate to defeat summary judgment. *See id.; Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir.1996) (finding employee's testimony regarding his doctor's statement to be hearsay and incompetent to oppose summary judgment); *see also Garcia v. Reeves County*, 32 F.3d 200, 204 (5th Cir.1994); *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 283 (5th Cir. 1991). Nevertheless, his claim of depression will be analyzed under the ADA as if Lottinger had furnished competent summary judgment evidence of its diagnosis.

unable to perform his job or engage in other major life activities.

In *Burch,* a similar case involving alcoholism, the plaintiff testified that his ability to perform some functions, including sleeping, was affected when he drank too much. *See* 119 F.3d at 316. When rejecting the notion that the plaintiff's alcoholism constituted a qualifying disability, the Fifth Circuit observed:

> Burch makes reference to his testimony that his ability to walk, talk, think, and sleep were affected when he drank too much. Burch also testified that he had hangovers in the morning that affected his memory. That Burch's inebriation was temporarily incapacitating is not determinative. Burch produced no evidence that the effects of his alcoholism-induced inebriation were qualitatively different than those achieved by an overindulging social drinker; in both situations, the natural result of overindulgence is the *temporary* impairment of senses, dulled reactions, and the prospect of a restless sleep followed by an unpleasant morning. Although Burch's alcoholism assuredly affected how he lived and worked, "far more is required to trigger coverage under § 12102(2)(A)." *Ellison v. Software Spectrum,* 85 F.3d 187, 191 (5th Cir. 1996). Burch's testimony that his inebriation was frequent does not make it a permanent impairment. Permanency, not frequency, is the touchstone of a substantially limiting impairment. Although Burch's alcoholism may have been permanent, he offered no evidence that he suffered from any substantially limiting impairment of any significant duration. We have previously rejected attempts to transform temporary afflictions into qualifying disabilities.

*Id.* (emphasis in original). Similarly, Lottinger has produced no evidence indicating that the effects of his inebriation were any different than those experienced by overindulging social drinkers.

Like Burch, Lottinger appears to suggest that the mere fact that he was ultimately hospitalized establishes that his alcoholism and depression substantially limited his major life activities. As the *Burch* court held, however, "[t]he ADA requires an individualized inquiry beyond the mere existence of a hospital stay." *Id.* at 317. "To accept [Lottinger]'s reading would work a presumption that any condition requiring temporary hospitalization is disabling—a presumption that runs counter to the very goal of the ADA." *Id.; see Schneiker,* 200 F.3d at 1061 (several hospitalizations for major depression did not render plaintiff disabled under the ADA). Thus, Lottinger's short stays in treatment programs, even his temporary hospitalization, do not establish that he was disabled within the meaning of the ADA. On the contrary, Lottinger repeatedly stated at deposition that he was able to perform his job duties throughout the time period at issue.

The evidence also fails to demonstrate that Lottinger's alleged impairment prevented him from performing an entire class of jobs or even a broad range of jobs. At deposition, Lottinger testified that Logan changed his job title from coordinator to team leader and later to team member, explaining that he "[j]ust felt like it should be more of a team concept and that he didn't feel that I should be the coordinator, in light of my absence." He noted that his job responsibilities changed as well:

> A. I was no longer responsible for the other two analysts. I used to be; I would analyze their work plus mine. And he no longer—I was basically just a member of the 3 team. I was taken from the leader of the team to just a team member. He softened the blow by

calling it team leader, which eventually changed to just proposal processing. He did it in three steps and he did it slowly.

Q. Well, the first step sounds like it would be less work for you than you had before, if you don't have to supervise two other analysts?

A. But he also at the same time gave me the file system program, which was basically a clerical position, a clerical job.

Q. What were you supposed to do?

A. Shell's real estate files are about a thousand paper files, including engineering reports, demographic reports, environmental reports, site layouts, summaries from the district real estate, dates of submittal, dates of approval, dollars approved, and he wanted me to pull each of those files by region, by state, and develop a database, a spread sheet, which I did, over a period of a long time, and open each file, pull the files, carry them to my office and in my spare time and in the evenings, to take the information out of each one of those paper files and put them into a spread sheet, an X–L spread sheet. Basically, a clerical position, which the department knew, all of my peers knew and recognized as a secretarial job.

\* \* \* \* \* \*

It was very—it took a lot of time and it took a lot of pulling stacks of files. On top of doing my normal proposal work.

Q. What was your normal proposal work?

A. Gathering real estate—all the stuff that I told you, gathering all that and writing a summary report and a 20–year cash flow model, figuring out the net present value, the cash income and then writing a summary to the vice president and then putting that into a leather folder and walking it over to the vice president of marketing and presenting it to him personally. And then, if he didn't have time to read it, to give him a verbal summary and to get his approval on Shell's investments to the tune of anywhere from $200,000 to $5 million. And I was expected to do at least one or two of those a day plus this other file work.

Lottinger also stated that he had to work many nights as late as 10:00 p.m. He added, however, that, while it was difficult, neither his depression nor his alcoholism made it impossible for him to do his job:

Q. Okay. Your depression didn't make it impossible for you to do this job?

A. No.

Q. Nor did your alcoholism make it impossible for you to do this job?

A. No.

Here, Lottinger manifestly "retain[ed] the ability to compete successfully with similarly skilled individuals and no facts indicate that he [was] unable to perform a class of jobs nor a broad range of jobs." *Hamilton,* 136 F.3d at 1051; *see Cash,* 231 F.3d at 1306–07; *Schneiker,* 200 F.3d at 1061; *Gaul v. Lucent Tech., Inc.,* 134 F.3d 576, 580 n. 3 (3d Cir.1998); *Foreman,* 117 F.3d at 805–06. At deposition, Lottinger conceded that could perform his job and continued to accomplish his assigned tasks, although it took him approximately six months to complete the database project, working sometimes as late as 10:00 p.m. and on Saturdays. In fact, according to Lottinger, Logan administered performance reviews in September 1996 and March 1997, at which "[j]ust basically we discussed work performance, which in both instances was good." Rather, Lottinger professed the belief that giving him the clerical assignment was "beneath him," "unreasonable," and "abusive," contending that he should have been able to share the assignment with co-workers.

Thus, while Lottinger's alcoholism and alleged depression may have caused him some difficulties and affected how he lived and worked, he has not shown that he had an impairment that substantially limited a major life activity. *See Burch,* 119 F.3d at 316 (although alcoholism affected how the plaintiff lived and worked, far more is required to trigger coverage under the ADA); *accord Cooper,* 246 F.3d at 1088 (plaintiff's description of her thirty-year history of depression as causing a "negative impact" was not sufficient to allow an inference of a substantial limitation); *Cash,* 231 F.3d at 1306 (while plaintiff's diabetes, migraines, and depression have had an adverse impact on her life, there is no evidence that they have limited her in a major life activity); *Nelson,* 2000 WL 743684, at *4 (plaintiff failed to show that alcoholism constituted an impairment that substantially limited one or more major life activities, noting that the condition never compromised his ability to perform his job); *Winkle v. Southwestern Bell Tel. Co.,* 195 F.3d 418, 419 (8th Cir.1999) (absent evidence that a major life activity was impaired by his depression, former employee failed to prove that he had a disability within the meaning of the ADA); *Palmer v. Circuit Court of Cook County,* 117 F.3d 351, 352 (7th Cir.1997), *cert. denied,* 522 U.S. 1096, 118 S.Ct. 893, 139 L.Ed.2d 879 (1998) (depression and anxiety caused by conflict with supervisor or coworker did not constitute a disability); *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 (7th Cir.1996) (heightened anxiety and stress, migraines and depression triggered by an unpleasant supervisor were not substantial limitations on a major life activity). Moreover, he has not provided any medical records, reports, opinions, or documents that even suggest, let alone confirm, that his ability to work or function in any other capacity was substantially limited by his health. *See Adams v. Rochester Gen. Hosp.,* 977 F.Supp. 226, 232 (W.D.N.Y.1997). Therefore, Lottinger has not demonstrated that he had a physical or mental impairment that substantially limited one or more of his major life activities.

### b. *Record of Impairment*

▮ Likewise, Lottinger has failed to produce evidence that he has a record of an impairment. *See* 42 U.S.C. § 12102(2)(B); *Sherrod,* 132 F.3d at 1120; *see also Pryor,* 138 F.3d at 1028; *Robinson,* 101 F.3d at 37. "Although the ADA does not define 'record of impairment,' the regulations provide: 'Has a record of such impairment' means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more of the major life activities." *Sherrod,* 132 F.3d at 1120 (quoting 29 C.F.R. § 1630.2(k)); *see Pryor,* 138 F.3d at 1028 (finding that record of injury to neck and subsequent surgery, hospitalization, and inability to work for two years did not establish as a matter of law that employee had a record of a disability for purposes of the ADA); *Burch,* 119 F.3d at 322 (record of treatment for alcoholism did not establish record of disability); *Ray,* 85 F.3d at 227 (holding that an inability to perform continuous, heavy lifting or an inability to perform a particular job do not necessarily constitute a record of disability). It is not enough for an ADA plaintiff simply to show that he has a record of an adverse medical diagnosis; "in order to establish the existence of a disability under § 12102(2)(B) there must be a record of an impairment that substantially limits one or more of the ADA plaintiff's major life activities." *R.J. Gallagher Co.,* 181 F.3d at 655; *see Burch,* 119 F.3d at 321–22 (citing 29 C.F.R. § 1630, App.).

Here, the mere fact that Lottinger purportedly consulted with Dr. Sim in 1995 and was prescribed anti-depressants or

that he was subsequently treated for alcoholism does not establish a record of an impairment. *See id.* at 322. Furthermore, inpatient counseling or a record of a medical diagnosis alone does not establish a substantially limiting impairment. *See R.J. Gallagher Co.,* 181 F.3d at 655; *Exxon Corp.,* 124 F.Supp.2d at 997. Significantly, Lottinger has adduced no evidence aside from his deposition testimony and answers to interrogatories to corroborate his claims of medical diagnoses, hospital stays, and doctor's appointments. In any event, as discussed above, Lottinger has failed to show that either of his alleged impairments substantially limited a major life activity. Thus, Lottinger has not shown that he was disabled under the second definition of disability set forth in the ADA.

### c. *Regarded as Having Such Impairment*

■ Similarly, Lottinger has not shown that he was regarded by others as having such an impairment, nor has he demonstrated that he was treated as having such an impairment. *See Deas,* 152 F.3d at 481–82; *Pryor,* 138 F.3d at 1028; *Sherrod,* 132 F.3d at 1121. "Under the ADA, an individual may qualify as 'disabled' if he or she is 'regarded as' having an impairment that substantially limits one or more major life activities." *Deas,* 152 F.3d at 475 (citing *Burch,* 119 F.3d at 322; *Bridges,* 92 F.3d at 332). Under the EEOC's implementing regulations, an employee qualifies for protection under the ADA's "regarded as" prong in three situations:

"One is regarded as having a substantially limiting impairment if the individual (1) has an impairment which is not substantially limiting but which the employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially

limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment."

*Id.* (quoting *Bridges,* 92 F.3d at 332); accord *Zenor,* 176 F.3d at 859; *see* 29 C.F.R. § 1630.2(1)-(3). "Under the 'regarded as' prong, the disability status of the plaintiff turns not on the plaintiff's physical condition, but rather on how the plaintiff was perceived and treated by those alleged to have taken discriminatory action." *Deas,* 152 F.3d at 476 n. 9.

To make a *prima facie* showing of disability under this provision, the plaintiff must produce sufficient evidence for a reasonable trier of fact to conclude that the employer perceived him, however erroneously, as having an impairment that substantially limited one or more of his major life activities. *See Zenor,* 176 F.3d at 860; *Deas,* 152 F.3d at 476; *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 143 (3d Cir.1998); *Pryor,* 138 F.3d at 1028; *Hamilton,* 136 F.3d at 1051; *Sherrod;* 132 F.3d at 1121; *see also Francis v. City of Meriden,* 129 F.3d 281, 285 (2d Cir.1997). "For an employer to regard an impairment as substantially limiting work, the employer must regard an individual as significantly restricted in his ability to perform a class or broad range of jobs." *Hamilton,* 136 F.3d at 1051–52 (citing *Burch,* 119 F.3d at 322; *Bridges,* 92 F.3d at 332). " '[A]n employer does not necessarily regard an employee as having a substantially limiting impairment simply because it believes [he] is incapable of performing a particular job.' " *Pryor,* 138 F.3d at 1028 (quoting *Ellison,* 85 F.3d at 192). "An employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in

general." *Foreman,* 117 F.3d at 807 n. 10 (citing *Chandler,* 2 F.3d at 1393); *see Deas,* 152 F.3d at 481 n. 22; *Forrisi,* 794 F.2d at 934. Furthermore, if the employer's belief corresponds to the employee's or his physician's description of his limitations, the employer cannot be viewed as improperly regarding him as disabled. *See Byrne v. Board of Educ.,* 979 F.2d 560, 567 (7th Cir.1992) (refusing to find plaintiff disabled when employer "treated her as having an impairment because she so defined herself"); *Bernard v. Doskocil Cos., Inc.,* 861 F.Supp. 1006, 1013 n. 13 (D.Kan. 1994) ("[a]lthough [the employer] apparently did, based on the work restrictions prescribed by [the plaintiff's physician], regard plaintiff as having a condition which prevented him from performing certain functions, prong (3) is intended to encompass those situations in which an employee regards someone as disabled based on certain stereotypes or myths, not a situation where a person is regarded as having limitations because a doctor has said so").

In the present case, although his job title changed after his repeated absences and he was assigned additional clerical duties, there is no evidence that Lottinger was regarded as or treated as having a disability. Indeed, he complains that he was required to work late and on weekends, contending that his duties should have been shared with his co-workers, and asserts that his health problems were largely ignored by his immediate supervisor. According to Lottinger, in his last meeting with Hudson, at the time of his termination, he asked Hudson "if he had considered the depression issue and he said, 'No, the depression is not an issue.'" Moreover, while he may have been regarded as an alcoholic, there is no evidence that management misperceived Lottinger as being substantially limited in a major life activity. *See Burch,* 119 F.3d at 322 (finding no evidence that employer regarded

his alcoholism as substantially limiting his ability to work or his other major life activities); *see also Doyal,* 213 F.3d at 499. Thus, Lottinger has not shown that he was regarded as having a substantially limiting impairment as a result of his alleged depression or alcoholism.

Because Lottinger has not demonstrated that he suffered from an impairment that substantially limited a major life activity, had a record of such an impairment, or was treated as having a substantially limiting impairment, he cannot establish that he had a disability within the purview of the ADA. Hence, Lottinger is unable to present a *prima facie* case of disability discrimination, making summary judgment proper on his ADA claims.

### 3. *Return–to–Work Agreement*

 Significantly, as Shell points out, courts have specifically held that an employer may terminate the employment of an alcoholic employee for failing to abide by the terms of a return-to-work agreement without violating the ADA. *See Nelson,* 2000 WL 743684, at *4; *Keith v. Ashland, Inc.,* 205 F.3d 1340, 2000 WL 178389, at *4–5 (6th Cir. Feb.8, 2000); *Mararri v. WCI Steel, Inc.,* 130 F.3d 1180, 1183 (6th Cir.1997); *Williams v. Houston Lighting & Power Co.,* 980 F.Supp. 879, 884 (S.D.Tex.1997); *McKey,* 956 F.Supp. at 1315–19. In *McKey,* the employer conditioned the alcoholic plaintiff's continued employment on his execution of a return-to-work agreement in which he promised to refrain from alcohol abuse. *See id.* After a subsequent blood-alcohol test revealed that the plaintiff had been drinking at the time of an automobile accident, the employer terminated him for violating the return-to-work agreement, prompting him later to bring suit under the ADA. *See id.* at 1313, 1315–16. The court, finding that the employee's breach of the agreement

was a legitimate reason for his termination and that he had failed to demonstrate pretext, recognized "an important distinction between discharging an employee for unacceptable misconduct and discharging an employee because of a disability." *Id.* at 1319. "The ADA specifically provides that an employer may hold an alcoholic employee to the same performance and behavior standards to which the employer holds other employees 'even if any unsatisfactory performance is related to the alcoholism of such employee.'" *Id.* (quoting 42 U.S.C. § 12114(c)(4)). As with McKey, Lottinger's violation of the return-to-work agreement "constitute[d] misconduct sufficient to terminate his employment, even if that misconduct was related to his alcoholism." *Id.*

The *McKey* court acknowledged that the "[p]laintiff would not have entered into the Return to Work Agreement had it not been for his alcoholism," but found that McKey was terminated because he breached the agreement, not because he was an alcoholic. *Id.* The court further recognized that the return-to-work agreement itself was a reasonable attempt to accommodate McKey's alleged disability. *See id.* Likewise, the court in *Williams* found that the employer had a legitimate, nondiscriminatory reason for requiring the chemical-dependent plaintiff to sign a return-to-work agreement in order for her to continue employment. *See* 980 F.Supp. at 884–85.

Here, Shell gave Lottinger more than one opportunity to receive treatment, complete rehabilitation, and return to work. These opportunities, nonetheless, proved to be inadequate, causing him to ask for yet another chance. As the Fifth Circuit has noted, however, "a 'second chance' or a plea for grace is not an accommodation as contemplated by the ADA." *Burch,* 119 F.3d at 320 (citing *Siefken v. Village of*

*Arlington Heights,* 65 F.3d 664, 666 (7th Cir.1995)); *see Evans v. Federal Express Corp.,* 133 F.3d 137, 140 (1st Cir.1998) (employer is not obliged to afford a second or multiple leaves of absence for substance abuse). Ultimately, Lottinger was terminated due to his continued drinking, a violation of the return-to-work agreements he had signed. He presents no evidence demonstrating that either his alcoholism or depression was the sole cause or even a motivating factor in his termination. *See Turco,* 101 F.3d at 1092; *Rizzo,* 84 F.3d at 763. Therefore, Lottinger has failed to establish a cognizable claim of discrimination under the ADA.

### D. *Family and Medical Leave Act*

#### 1. *Fundamentals*

"The FMLA was enacted to help working men and women balance the conflicting demands of work and personal life. It does so by recognizing that there will be times in a person's life when that person is incapable of performing [his] work duties for medical reasons." *Price v. City of Fort Wayne,* 117 F.3d 1022, 1024 (7th Cir.1997); *see* 29 U.S.C. § 2601(b)(1) & (2); *Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 975 (5th Cir.), *cert. denied,* 525 U.S. 826, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998). The FMLA is based in part on Congress's finding that there is " 'inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.'" *Id.* at 974–75 (quoting 29 U.S.C. § 2601(a)(4)). The FMLA seeks to accomplish its goals "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3).

The FMLA contains two distinct provisions—an entitlements clause and an anti-discrimination clause. *See* 29 U.S.C. §§ 2612, 2615; *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir.

1998). The FMLA first provides certain enumerated rights to eligible employees. The Act requires covered employers to provide eligible employees up to twelve weeks per year of unpaid leave for any one of the following purposes: the birth, care, or placement of a child for adoption or foster care; to care for a close family member with a serious health condition; or when an employee has a serious health condition that makes the employee unable to perform the functions required by his position. *See* 29 U.S.C. § 2612(a)(1) & (c); *Hodgens,* 144 F.3d at 159; *see also Chaffin v. John H. Carter Co.,* 179 F.3d 316, 319 (5th Cir.1999); *Price v. Marathon Cheese Corp.,* 119 F.3d 330, 333 (5th Cir.1997). Leave taken by an employee for a serious health condition may be taken intermittently or on a reduced leave schedule when medically necessary. *See* 29 U.S.C. § 2612(b)(1); *Price,* 119 F.3d at 333. The FMLA makes clear that an employee "shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer." 29 U.S.C. § 2612(e)(2)(A). After a qualifying absence, the employer must restore the employee to the same position or to a comparable position as that held by the employee before the leave, with equivalent pay, benefits, and working conditions, and without a loss of accrued seniority. *See* 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.100; *Chaffin,* 179 F.3d at 319; *Hodgens,* 144 F.3d at 159; *Price,* 119 F.3d at 333.

The FMLA also protects employees from retaliation for exercising their rights under the statute. *See* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220; *Hodgens,* 144 F.3d at 159. The Act provides:

§ 2615. Prohibited acts

(a) Interference with rights

(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a)(1) & (2). Under these provisions,

[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c). "Thus, employers have a prescriptive obligation under the FMLA—they must grant employees substantive rights guaranteed by the FMLA—and they have a proscriptive obligation—they may not penalize employees for exercising these rights." *Chaffin,* 179 F.3d at 319; *see Nero v. Industrial Molding Corp.,* 167 F.3d 921, 927 (5th Cir.1999).

2. *Statutory Rights Claim*

 The first provision of the FMLA creates a series of substantive rights. *See Hodgens,* 144 F.3d at 159. "These rights are essentially prescriptive, 'set[ting] substantive floors' for conduct by employers, and creating 'entitlements' for employees." *Id.* (quoting *Diaz v. Fort Wayne Foundry*

*Corp.*, 131 F.3d 711, 712–13 (7th Cir.1997)); *see* 29 U.S.C. §§ 2612, 2615. Discrimination is not at issue, and "the employer's intent is immaterial." *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1017 (7th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000) (quoting *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir.1999)); *see Hodgens,* 144 F.3d at 159. Consequently, an employer may not defend itself under the FMLA by claiming that it treated all employees identically, as the issue in dispute is whether it honored statutory entitlements—not whether it treated employees disparately. *See Diaz,* 131 F.3d at 712. Therefore, the *McDonnell Douglas* burden-shifting framework, which is utilized to analyze discrimination claims, is not applicable to FMLA substantive claims. *See King,* 166 F.3d at 892 n. 1; *Diaz,* 131 F.3d at 712–13. An employee who alleges a deprivation of his substantive statutory rights under the FMLA must "demonstrate by a preponderance of the evidence only entitlement to the disputed leave." *Rice,* 209 F.3d at 1017; *see Diaz,* 131 F.3d at 712–713; *see also O'Connor v. PCA Family Health Plan, Inc.,* 200 F.3d 1349, 1353 (11th Cir. 2000).

■ Under the FMLA, an employee who meets the tenure and hours requirements of 29 U.S.C. § 2611(2)(A) is entitled to as many as twelve weeks of unpaid leave over the course of twelve months "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves—

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

(B) continuing treatment by a health care provider."

29 U.S.C. § 2611(11); *see Hodgens,* 144 F.3d at 160; *Satterfield,* 135 F.3d at 975; *Price,* 119 F.3d at 333–34. Under the regulations construing the FMLA, a "serious health condition" is defined as an illness, injury, impairment, or physical or mental condition that involves:

(1) Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom), or any subsequent treatment in connection with such inpatient care; or

(2) Continuing treatment by a health care provider.

29 C.F.R. § 825.114(a)(1) & (2); *see Hodgens,* 144 F.3d at 161; *Price,* 119 F.3d at 334.

The Fifth Circuit utilizes a "bright line" test for determining whether an illness qualifies as a "serious health condition":

If an employee is "(1) incapacitated for more than three days, (2) seen once by a doctor, and (3) prescribed a course of medication, such as an antibiotic, [he] has a 'serious health condition' worthy of FMLA protection."

*Price,* 119 F.3d at 335 (quoting *Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028, 1036 (M.D.Tenn.1995)). The Fifth Circuit has also held:

Thus, under the regulation, where an employee alleges that he has a serious health condition involving continuing treatment by a health care provider, he must first demonstrate a period of incapacity (i.e., the inability to work) for at least four consecutive days. Next, he must show that he received subsequent treatment or had a period of incapacity,

in which he was either seen at least two times by a health care provider (or a qualified provider of health care services) or obtained a regimen of continuing treatment under the supervision of a health care provider.

*Murray v. Red Kap Indus., Inc.*, 124 F.3d 695, 698 (5th Cir.1997). The FMLA further requires an employee who requests leave due to a "serious health condition" to provide his employer with not less than 30 days' notice before the date of leave is to begin, or if the leave is required to begin in less than 30 days, to provide such notice as is practicable. *See* 29 U.S.C. § 2612(e)(2)(B).

Here, it is unclear whether Lottinger has, in fact, brought a claim under the FMLA for a statutory rights violation. In his petition, he appears to allege only a claim for retaliation. In his response to the motion for summary judgment, however, he discusses protection for a serious health condition. Arguably, Lottinger had a serious health condition, as his alleged depression and alcoholism required him to seek regular care and treatment from rehabilitation programs, physicians, and counselors, to be hospitalized once, and to be prescribed a regular course of antidepressants. To prevail on a claim that his statutory rights were violated, however, Lottinger must show that he was entitled to leave "[b]ecause of a serious health condition that makes [him] unable to perform the functions of [his] position." 29 U.S.C. § 2612(a)(1)(D).

It is undisputed that Lottinger was afforded paid leave on more than one occasion to obtain treatment for his alcoholism. At deposition, Lottinger testified that, after his release from St. Joseph's Hospital, he left a telephone message with Randall Ray ("Ray"), a Human Resources representative, asking for permission to use three weeks of accrued vacation time for his recovery. He claims that Ray never returned his call. In response to Interrogatory 3, he stated that he made the same request of Peterson, who said he would inquire and let him know, and that he asked Hudson on the day he was terminated, who denied the request.

Lottinger does not contend that Shell ceased paying him or denied him benefits following his hospitalization and prior to his termination. At deposition, he related that after his release from the hospital, Peterson directed him to stay home while Shell decided whether it would continue to employ him. More importantly, although Lottinger claims that he requested an extended leave of absence after relapsing yet again, he does not assert that additional leave was mandated because his health condition rendered him "unable to perform the functions of" his position, as necessary to qualify for FMLA leave. *See* 29 U.S.C. § 2612. In fact, he testified that he wanted to return to work and reiterated that his work performance was never adversely affected by his alleged depression or alcoholism. Moreover, Lottinger has not shown that he gave Shell reasonable notice of his request for leave. Thus, Lottinger has not demonstrated the existence of a fact issue regarding his statutory rights claim, and summary judgment is warranted.

### 3. Retaliation

"[T]he FMLA provides protection in the event an employee is discriminated against for exercising [the rights afforded by the statute]." *Hodgens*, 144 F.3d at 159–60 (citing 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220). "These provisions are essentially proscriptive." *Id.* at 160. For any violation of such provisions, "the employer is subject to a claim for compensatory damages and, unless the court finds the violation occurred in good faith, additional liquidated damages." *Id.* (citing 29

U.S.C. § 2617(a)(1)(A)). "'In contrast to what an employee must show to establish a deprivation of a substantive guarantee under the Act, when an employee raises the issue of whether the employer discriminated against an employee by taking adverse action against the employee for having exercised an FMLA right, the question of intent is relevant. The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus.'" *Rice,* 209 F.3d at 1017 (quoting *King,* 166 F.3d at 891).

Retaliation claims brought under the FMLA are analyzed under the same standards that are applied to retaliation claims brought under Title VII and comparable employment discrimination statutes. *See Chaffin,* 179 F.3d at 319; *King,* 166 F.3d at 891; *Hodgens,* 144 F.3d at 160; *Diaz,* 131 F.3d at 712–13; *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). As with other anti-discrimination statutes, "the employee bears the burden of proving that the employer's actions were motivated by the considerations prohibited by the statute." *Hypes v. First Commerce Corp.,* 134 F.3d 721, 726 (5th Cir.1998). The Fifth Circuit has held that the burden-shifting technique applicable to Title VII disparate treatment claims also applies to claims of unlawful retaliation. *See Medina v. Ramsey Steel Co.,* 238 F.3d 674, 684 (5th Cir.2001); *Haynes v. Pennzoil Co.,* 207 F.3d 296, 299 (5th Cir.2000); *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir. 1996) (citing *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983)).

Therefore, "if the plaintiff can establish a prima facie case of retaliation, the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment action." *Sherrod,* 132 F.3d at 1122; *see Medina,* 238 F.3d at 684; *Haynes,* 207 F.3d at 299; *Chaffin,* 179 F.3d at 319–20;

*Bocalbos v. National Western Life Ins. Co.,* 162 F.3d 379, 383 (5th Cir.1998), *cert. denied,* 528 U.S. 872, 120 S.Ct. 175, 145 L.Ed.2d 148 (1999); *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1249 (5th Cir.1995) (citing *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir.1992)); *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 267 (5th Cir. 1994). "If the defendant advances a legitimate reason for the adverse employment action, then the plaintiff must adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation." *Sherrod,* 132 F.3d at 1122 (citing *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817; *Grizzle,* 14 F.3d at 267); *see Chaffin,* 179 F.3d at 320; *Bocalbos,* 162 F.3d at 383; *Ray,* 51 F.3d at 1249 (citing *Shirley,* 970 F.2d at 42). "If the defendant introduces evidence which, if true, would permit the conclusion that the adverse employment action was nondiscriminatory, the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff." *Haynes,* 207 F.3d at 299; *see Medina,* 238 F.3d at 684; *Grizzle,* 14 F.3d at 267; *Long,* 88 F.3d at 305. To carry his ultimate burden, "an employee must also show that [his] employer would not have taken the adverse employment action 'but for' the employee's participation in the protected activity." *Scrivner v. Socorro Indep. Sch. Dist.,* 169 F.3d 969, 972 (5th Cir.1999); *see Medina,* 238 F.3d at 684; *Walton v. Bisco Indus., Inc.,* 119 F.3d 368, 370 (5th Cir.1997); *Long,* 88 F.3d at 305 n. 4; *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 435–36 (5th Cir.1995).

▮ To establish a *prima facie* case of retaliation under the FMLA, the plaintiff must show that:

(1) he availed himself of a right protected under the FMLA;

(2) he was adversely affected by an employment decision; and

(3) a causal connection exists between the employee's protected activity and the employer's adverse employment action.

See *Hodgens*, 144 F.3d at 161; *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir.1997); *Morgan*, 108 F.3d at 1324; *see also Chaffin*, 179 F.3d at 319; *King*, 166 F.3d at 891; *Bocalbos*, 162 F.3d at 383. The employee must demonstrate that the exercise of his rights under the FMLA was a motivating or determining factor in the adverse employment action taken by the employer, *i.e.*, there must be a causal connection. See *Hodgens*, 144 F.3d at 160; *Hypes*, 134 F.3d at 726. "The burden of establishing the 'causal link' in the prima facie case is much less onerous than the burden of proving 'but-for' causation required for the determination of the ultimate issue of retaliation." *Sherrod*, 132 F.3d at 1122 n. 8; *see Long*, 88 F.3d at 305 n. 4. A plaintiff need not prove that his protected activity was the sole factor motivating the employer's challenged decision in order to establish the requisite causal link. *See Sherrod*, 132 F.3d at 1122.

 Here, each time Shell granted him leave to obtain treatment for alcoholism, Lottinger availed himself of a right protected under the FMLA. Moreover, as discussed above, his termination qualifies as an adverse employment action. Lottinger has not, however, adduced evidence that his termination can be attributed to his taking leaves of absence for treatment or hospitalization. At deposition, Lottinger complained of actions Shell allegedly took after he returned from his leaves of absence, including the change of his job title, the decrease in his previous responsibilities, and the addition of clerical duties that sometimes required him to work late hours and Saturdays, which he viewed as unreasonable and discriminatory. He does not, however, allege that he lost pay or benefits due to these changes. Rather, he deemed the clerical work to be "beneath him," complaining to Logan that he should not have been required to perform it or should have been allowed to share it with co-workers, but he was met with a negative reaction:

Q. All right. Did you ever tell Mr. Logan that you shouldn't be doing this work, that someone else should be doing it?

A. Yes.

Q. What did he say to you?

A. His attitude, he didn't care. His words were, "If you don't have time to do it in the day, 10:00 at night."

\* \* \* \* \* \*

A. If I was to be given the assignment, all three of us should have been given the assignment.

Q. Did you tell Mr. Logan that?

A. Yes.

Q. And what did he say?

A. "It's your job. I don't care if it takes until 10:00 at night to do it."

Lottinger further asserted:

Each time I went back, I was treated worse. I was told that, one, there was no money in the budget for my job [although he concedes that he remained in his job]. I was given this extra project. I was told to post out of the department. I was called into a meeting with my peers and embarrassed with the people that I worked with by Lloyd Logan. I was told by Mr. Lloyd Logan that when I was working on this project that he didn't care if it took me until 10:00 at night; if I had to work until 10:00 at night to finish the project, that he wanted it done. His words. There were other people in the meeting. Oth-

er people heard it in the department, heard him say that specifically. He didn't care if it was 10:00 that I had to work, knowing that I had to go to my evening meetings, go to AA meetings, go to meet my counselors after work but there was no regard for that piece of my recovery or my personal time.

Additionally, while not entirely clear, he described an incident in which he claims he was embarrassed in front of his peers:

A. Mr. Logan, when I came back from recovery one time, had the other two analysts in his office and asked me to come in and drew a circle on the wall around a site plan and said, "What is that?" And I was like, "I don't understand. What do you mean by 'what is that'?" He goes, "What is that?" And I said, "It's a site plan with a circle around it." And he goes, you know, "No, that's our profit center." But those were the kind of little games he played in front of the other two analysts who used to work for me. That was the type of treatment that I had from him with the other two analysts who used to be my reports, but that was just one instance.

* * * * * *

Q. And what else did he do to embarrass you?

A. Like giving me the—he was the one that assigned me the filing project, which everybody knew was a—just a filing project. It was no-brainer work that took a lot of time.

He also cites as discriminatory the fact that he was required to submit to random drug tests, which caused him to leave his department once or twice a week without explanation, creating tension between him and his co-workers who thought he was "just taking a stroll around downtown," to attend AA meetings and submit signatures to Shell to prove his attendance, to attend rehabilitation "aftercare" meetings, and to meet with a counselor at inconvenient times and locations.

In addition, Lottinger complains that while staying at A Better Way immediately prior to his official termination, he would call Peterson to check on his status, and:

the first question he would ask me is, "Where are you?" And I'd say, "I'm at A Better Way." It was like he doubted—it was like they wanted me to fail, like they knew—and this is my speculation—that it's like they sent me to someplace thinking I would never make it, that I would run. And every time I called the first question that came out of anybody's mouth was "are you still there?" And they made me wait about a month before they called me in to terminate me. My feelings were they were trying to see if I'd quit to save them the problem of having to fire me.

Lottinger further maintains that "there also lies an issue as to whether the implementation of new policies after his absence constitutes disparate treatment in direct violation of the FMLA," alleging that Shell informed him that he would have to complete one year in a rehabilitation program before he would be considered for re-employment. Many of these alleged actions were of *de minimis* import and none of them indicate that Shell took adverse action against him as a result of his taking qualified leave.

Instead, the record reflects that Shell terminated Lottinger because he resumed his alcohol abuse, which was a direct violation of his return-to-work agreements. Lottinger appears to acknowledge that Shell discharged him for resuming drinking, yet he posits that, because he suffered from alcoholism and depression, Shell should have granted him further leave for

an extended treatment period rather than terminating him. In a similar situation, the Fourth Circuit held that the termination of an alcoholic employee while committed for detoxification did not violate the FMLA. *See Sloop v. ABTCO, Inc.*, 178 F.3d 1285, 1999 WL 280281, at *1 (4th Cir.), *cert. denied*, 528 U.S. 930, 120 S.Ct. 327, 145 L.Ed.2d 255 (1999). The court reasoned that the plaintiff's absence from work was due to his use or consumption of alcohol as opposed to leave required for court-ordered treatment seven days later. *See id.* at *2. The court also noted that there is no indication that Congress intended the FMLA to cover medical leave precipitated by substance abuse without regard to the personal responsibility of the employee. *See id.* at *3. Similarly, when faced with an FMLA challenge, the Tenth Circuit upheld the termination of an employee while on leave for alcohol treatment when the employer showed that she was discharged for her continued drinking as opposed to her request for leave. *See Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723, 732–33 (10th Cir. 2000). As the court observed, "[t]he applicable regulation provides that an employee may be laid off if the action would have been taken in the absence of FMLA leave." *Id.* at 732 (citing 29 C.F.R. § 825.216(a)).

In the final analysis, Lottinger's subjective perception of FMLA discrimination is all that remains. It is well established, however, that an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *See, e.g., Price*, 119 F.3d at 337; *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir.1996); *Douglass*, 79 F.3d at 1430; *Ray*, 63 F.3d at 434; *Armendariz*, 58 F.3d at 153; *EEOC v. Louisiana Office of Community Servs.*, 47 F.3d 1438, 1448 (5th Cir.1995); *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325,

329 (5th Cir.1994); *Grizzle*, 14 F.3d at 268. When, as here, an employee fails to adduce objective evidence refuting the legitimate, nondiscriminatory reasons articulated by the employer, pretext cannot be established by subjective beliefs that discrimination motivated the employer's actions. *See Armendariz*, 58 F.3d at 153; *Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984).

In this instance, Shell had a legitimate reason for terminating Lottinger—his resumption of alcohol abuse in violation of the return-to-work agreements he signed. Lottinger has adduced no evidence suggesting that this reason was pretextual. He has made no showing that his termination was the result of his taking leaves of absence for alcoholism treatment or his request for additional leave. Thus, summary judgment is appropriate as to Lottinger's claims under the FMLA.

### E. *Employee Retirement Income Security Act*

■ Lottinger further contends that Shell's alleged discriminatory actions give rise to a valid claim under ERISA for the denial of medical benefits for the treatment of alcoholism and depression. ERISA applies to employee benefit plans " 'established by or maintained by an employer or employee organization' " engaged in interstate commerce. *Meredith v. Time Ins. Co.*, 980 F.2d 352, 354 (5th Cir.1993) (quoting 29 U.S.C. § 1003(a)). "In enacting ERISA, Congress designed a comprehensive system of regulating employee benefit plans in order 'to provide the maximum degree of protection to working men and women' whose employers provide benefits." *Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444, 448 (4th Cir.1993), *cert. denied*, 511 U.S.

1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994) (quoting S.Rep. No. 127, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4838, 4854). Two types of employee benefit plans are governed by ERISA: "employee welfare benefit plans" and "employee pension benefit plans." *See Weaver v. Employers Underwriters, Inc.*, 13 F.3d 172, 175 (5th Cir.), *cert. denied*, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 866 (1994) (citing 29 U.S.C. § 1002(3)). An "employee welfare benefit plan" is defined as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits . . . .

29 U.S.C. § 1002(1); *see California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 323 n. 2, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997); *Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 408 (9th Cir.), *cert. denied*, 516 U.S. 942, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995); *Madonia*, 11 F.3d at 446; *Meredith*, 980 F.2d at 354.

Here, although the record is devoid of such evidence, the parties do not dispute that Lottinger was the beneficiary of a plan governed by ERISA. While not discussed in its motion, Shell pleaded as an affirmative defense that Lottinger failed to exhaust his administrative remedies with regard to his ERISA claim. "[A] plaintiff generally must exhaust all administrative remedies afforded by [his] plan before filing an ERISA claim in federal court."

*Hager v. NationsBank N.A.*, 167 F.3d 245, 247 (5th Cir.1999); *accord Bourgeois v. Pension Plan for Employees of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000); *Hall v. National Gypsum Co.*, 105 F.3d 225, 231 (5th Cir.1997); *Denton v. First Nat'l Bank of Waco*, 765 F.2d 1295, 1300 (5th Cir.1985) (citing *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir.1980)). A court may dismiss a cause of action *sua sponte* for failure to exhaust administrative remedies. *See Dougherty County Sch. Sys. v. Bell*, 694 F.2d 78, 80 (5th Cir.1982). In this instance, Lottinger has presented no evidence, nor does he allege, that he pursued his administrative remedies before bringing his claim. Thus, his ERISA claim may be dismissed for failure to fulfill the exhaustion requirement.

> In any event, ERISA provides in part: It shall be unlawful for any person to discharge, . . . or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, . . . , or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140. The plaintiff "must show his discharge was motivated by his employer's desire to retaliate against him for exercising such a right or with the attainment of benefits to which he might become entitled." *Carlos v. White Consol. Indus., Inc.*, 934 F.Supp. 227, 232 (W.D.Tex.1996) (citing *McGann v. H & H Music Co.*, 946 F.2d 401, 404 (5th Cir. 1991), *cert. denied*, 506 U.S. 981, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992)). "[S]peculative allegations that [the employer] had something to gain by terminating [his] employment are insufficient to create a genuine issue of material fact precluding sum-

mary judgment." *Simmons v. Willcox*, 911 F.2d 1077, 1082 (5th Cir.1990) (citing *Clark v. Resistoflex Co.*, 854 F.2d 762, 771 (5th Cir.1988)).

To succeed on his claim, Lottinger must show that "the loss of benefits was more than an incidental loss from his discharge, and this inference of discrimination can be proven by circumstantial evidence." *Stafford v. True Temper Sports*, 123 F.3d 291, 295 (5th Cir.1997) (citing *Carlos*, 934 F.Supp. at 232). "To dispel the inference of discrimination which would arise from a prima facie case [under § 1140], [the defendant] must articulate a non-discriminatory reason for its actions, and then the burden shifts to [the plaintiff] to prove this reason is a pretext and the real purpose was denial of ERISA benefits." *Id.* (citing *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 331 (1st Cir.1996)).

As Shell points out, Lottinger's ERISA claim is vague. Lottinger alleges that he was "intentionally discharged to reduce the costs associated with the rehabilitation of an employee," but he provides no further argument or any evidence to support his assertion. "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy [Lottinger's] burden." *Douglass*, 79 F.3d at 1429. Moreover, as discussed above, Shell has shown a legitimate, nondiscriminatory reason for terminating him—his resumption of alcohol abuse in violation of the terms of the return-to-work agreements. Lottinger, in turn, has adduced no evidence, circumstantial or otherwise, to indicate that Shell's reason was pretextual and that its actual motivation for terminating him was to avoid its obligation to provide benefits under ERISA. Furthermore, Lottinger does not claim or present evidence that Shell made oral or written representations to him indicating that he would be allowed to remain in treatment or to re-enter

treatment programs as frequently as he desired without regard to cost to the benefit plan. *See McGann*, 946 F.2d at 405.

Hence, assuming that Lottinger had exhausted his administrative remedies, he has not shown any specific discriminatory intent by Shell. Thus, Lottinger's ERISA claim fails on the merits, as well, mandating summary judgment.

### F. *Intentional Infliction of Emotional Distress*

■ Finally, Lottinger asserts a claim for intentional infliction of emotional distress under Texas law. To prevail on this claim, Lottinger must establish:

(1) the defendant acted intentionally or recklessly;

(2) the defendant's conduct was extreme and outrageous;

(3) the defendant's actions caused him emotional distress; and

(4) the emotional distress suffered by him was severe.

*See Walker v. Thompson*, 214 F.3d 615, 628 (5th Cir.2000); *Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir.2000); *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 613 (5th Cir.1999); *Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir.1998), *cert. denied*, 526 U.S. 1065, 119 S.Ct. 1457, 143 L.Ed.2d 543 (1999); *Bradford v. Vento*, No. 99–0966, —— S.W.3d ——, ——, 2001 WL 421238, at *7 (Tex. Apr.26, 2001).

■ While "extreme and outrageous," as used in the second element of this standard, is an amorphous phrase that escapes precise definition, there appears to be a consensus that conduct is "outrageous" if it is "atrocious" and surpasses "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." *See Skidmore*, 188 F.3d at 613; *Johnson v. Merrell Dow Pharm., Inc.*, 965 F.2d 31, 33

(5th Cir.1992); *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir.1989); *Bradford*, —— S.W.3d at ——, 2001 WL 421238, at *8; *Gaspard v. Beadle*, 36 S.W.3d 229, 237 (Tex.App.—Houston [1st Dist.] 2001, no pet. h.); *Escalante v. Koerner*, 28 S.W.3d 641, 647 (Tex.App.—Corpus Christi 2000, no pet.). In *Dean*, the Fifth Circuit (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)) explained:

> Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. . . . Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

885 F.2d at 306. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *See Walker*, 214 F.3d at 628; *Johnson*, 965 F.2d at 33; *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1143 (5th Cir. 1991); *Gaspard*, 36 S.W.3d at 237. "There is no occasion for the law to intervene in every case where someone's feelings are hurt." *Johnson*, 965 F.2d at 33. "It is only when such conduct becomes a regular and continuous pattern of behavior that it will rise to the level of extreme and outrageous conduct." *Gaspard*, 36 S.W.3d at 237.

■ Specifically, in the employment context, the Fifth Circuit, applying Texas law, has repeatedly stated that "ordinary employment disputes are not adequate for intentional infliction claims." *Estate of Martineau*, 203 F.3d at 913; *see City of Midland v. O'Bryant*, 18 S.W.3d 209, 217 (Tex.2000). The courts recognize that in order to manage its business properly, "an employer must be able to supervise, review, criticize, demote, transfer and discipline employees." *Wilson*, 939 F.2d at 1143; *see City of Midland*, 18 S.W.3d at 217 (employer's decision to revise job description or change the nature of position not sufficiently outrageous). Even actions that may be unlawful in an employment setting may not be the sort of behavior that constitutes "extreme and outrageous" conduct. *See Walker*, 214 F.3d at 628; *Skidmore*, 188 F.3d at 613; *Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 654 (5th Cir.1994). "It is not enough that the defendant has acted with an intent that is tortious or even criminal." *Washington v. Knight*, 887 S.W.2d 211, 216 (Tex.App.—Texarkana 1994, writ denied); *accord Bradford*, —— S.W.3d at ——, 2001 WL 421238, at *8; *Gorges Foodservice, Inc. v. Huerta*, 964 S.W.2d 656, 668 (Tex.App.—Corpus Christi 1997, no writ). "An employer's conduct rises to the level of extreme and outrageous conduct in only the most unusual cases." *Estate of Martineau*, 203 F.3d at 913 (citing *Prunty*, 16 F.3d at 654).

■ "[T]he fact of discharge itself as a matter of law cannot constitute outrageous behavior." *See Wornick Co. v. Casas*, 856 S.W.2d 732, 735 (Tex.1993) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 462 (6th Cir.1986) ("no liability for intentional infliction of emotional distress where an actor does no more than insist on its legal rights")). "An employer will not be held liable for exercising its legal right to terminate an employee, 'even though he is well aware that such [action] is certain to cause emotional distress.'" *Johnson*, 965 F.2d at 34 (quoting *Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 809 S.W.2d 514, 522 (Tex.App.—San Antonio 1991), *aff'd in part and rev'd in part on other grounds*, 844 S.W.2d 198 (Tex.1992)). "[T]he mere fact of termination of employment, even if the termination is wrongful, is not legally sufficient evidence that the

employer's conduct was extreme and outrageous under the rigorous standard that we established in *Twyman[ v. Twyman*, 855 S.W.2d 619 (Tex.1993)]." *Southwestern Bell Mobile Sys. v. Franco*, 971 S.W.2d 52, 54 (Tex.1998) (finding evidence "far short of being legally sufficient" when showed plaintiffs were fired "in the unnecessary presence of coworkers," were forced "to collect and remove their belongings in front of others," and the employer "immediately took steps to repossess car phones"); *accord City of Midland*, 18 S.W.3d at 217; *Gilmartin v. KVTV–Channel 13*, 985 S.W.2d 553, 556 (Tex.App.—San Antonio 1998, no pet.). Indeed, the Texas Supreme Court has found that termination coupled with "falsely depicting [the plaintiff] in the community as a thief" was not sufficiently outrageous to constitute intentional infliction of emotional distress. *Mendez*, 844 S.W.2d at 202. "[T]o hold otherwise would wholly undermine the employment at will doctrine by subjecting employers to 'a potential jury trial in connection with virtually every discharge.'" *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 742 (5th Cir.1993), *cert. denied*, 510 U.S. 1046, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994) (quoting *Wornick Co.*, 856 S.W.2d at 736).

■ Here, Lottinger has not described any conduct that even approaches extreme or outrageous behavior. The evidence submitted in support of this claim reflects that Lottinger was not subjected to any actions by Shell or its employees that could be viewed as surpassing "all possible bounds of decency." Lottinger's claim is nothing more than a typical employment dispute, which, under these circumstances, does not entail the egregious behavior indispensable to an actionable claim for intentional infliction of emotional distress. No doubt, being terminated can be a traumatic experience for any employee. *See*

*Johnson*, 965 F.2d at 34; *Dupre v. Harris County Hosp. Dist.*, 8 F.Supp.2d 908, 926 (S.D.Tex.1998). In this instance, however, there is no indication that Shell or its employees engaged in offensive or hostile behavior or that they denigrated, demeaned, or degraded Lottinger. Instead, the evidence reflects that Shell treated him in a professional manner, and, in fact, attempted to assist him in overcoming his alcoholism. In short, none of the conduct that Lottinger attributes to Shell is so vile or reprehensible as to be "utterly intolerable in a civilized community." *Dean*, 885 F.2d at 306.

Moreover, Lottinger has not shown that any emotional distress he may have suffered was severe. For a claim of intentional infliction of emotional distress to be cognizable under Texas law, there must be "sufficient proof of severe emotional distress, wholly apart from any outrageous conduct on the defendant's part." *American Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 341 (Tex.App.—Houston [14th Dist.] 1991, no writ); *see Badgett v. Northwestern Resources Co.*, 818 F.Supp. 998, 1003 (W.D.Tex.1993). "Severity of distress is an element of the cause of action, not simply a matter of damages." *Ewald v. Wornick Family Foods Corp.*, 878 S.W.2d 653, 660 (Tex.App.—Corpus Christi 1994, writ denied) (citing *Benavides v. Moore*, 848 S.W.2d 190, 195 (Tex. App.—Corpus Christi 1992, writ denied)); *see Huckabay v. Moore*, 142 F.3d 233, 242 (5th Cir.1998).

■ "Emotional distress" means any highly unpleasant mental reaction such as extreme grief, shame, humiliation, embarrassment, anger, disappointment, worry, and nausea. *See GTE S.W., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex.1999); *Behringer v. Behringer*, 884 S.W.2d 839, 844 (Tex. App.—Fort Worth 1994, writ denied); *see also Washington*, 887 S.W.2d at 216. In

order to recover damages, however, the plaintiff must prove more than mere worry, anxiety, vexation, or embarrassment. *See McCray v. DPC Indus., Inc.,* 875 F.Supp. 384, 392 (E.D.Tex.1995) (citing *Regan v. Lee,* 879 S.W.2d 133, 136 (Tex. App.—Houston [14th Dist.] 1994, no writ)); *Escalante,* 28 S.W.3d at 646; *Haryanto v. Saeed,* 860 S.W.2d 913, 923 (Tex.App.—Houston [14th Dist.] 1993, writ denied). "The law intervenes only where the distress is so severe that no reasonable person should be expected to endure it." *Behringer,* 884 S.W.2d at 844 (citing RE-STATEMENT (SECOND) OF TORTS § 46 cmt. j (1965)); *accord GTE S.W., Inc.,* 998 S.W.2d at 618; *Escalante,* 28 S.W.3d at 646.

 In this instance, Lottinger does not claim to have experienced any psychiatric problems as a result of Shell's conduct, like those encountered by the plaintiff in *Johnson.* *See* 965 F.2d at 33. Moreover, Lottinger has not alleged that he is afflicted with post-traumatic stress syndrome, as diagnosed in *Haryanto.* *See* 860 S.W.2d at 922. Furthermore, Lottinger does not contend that Shell's conduct caused him to suffer anything approaching the possibly suicidal, manic-depressive illness and bipolar disorder experienced by the plaintiff in *Wilson* or the debilitating headaches alleged by the plaintiff in *Clayton.* *See Wilson,* 939 F.2d at 1141; *Clayton v. Nabisco Brands, Inc.,* 804 F.Supp. 882, 885 (S.D.Tex.1992); *see also Motsenbocker v. Potts,* 863 S.W.2d 126, 135 (Tex. App.—Dallas 1993, no writ); *American Med. Int'l, Inc.,* 821 S.W.2d at 343. While Lottinger claims to have been suicidal on one occasion several weeks prior to his termination, at deposition, he attributed this to a temporary change in his medication, never asserting that it was related to Shell's conduct. Consequently, Lottinger's alleged emotional distress cannot be said to be "so severe that no reasonable person could be expected to endure it." *Benavides,* 848 S.W.2d at 195.

Thus, Lottinger has failed to adduce sufficient facts to support two of the required elements of an intentional infliction of emotional distress claim under Texas law—extreme conduct and severe distress. Therefore, summary judgment on this claim is warranted.

### III. *Conclusion*

In summary, Lottinger's claims under the TCHRA are untimely, his disability claim based on alcoholism is specifically precluded under the TCHRA, and his disability claim based on depression is without merit. Furthermore, Lottinger has not shown that he was a qualified individual with a disability, as required by the ADA. He, likewise, has failed to demonstrate that he was entitled to additional leave under the FMLA or was retaliated against in violation of the FMLA. Additionally, Lottinger's claims under ERISA are unexhausted and, in any event, are groundless. Finally, in the absence of evidence to support two required elements, Lottinger cannot succeed on his claim for intentional infliction of emotional distress under Texas law.

Accordingly, Shell's motion for summary judgment is GRANTED. There exist no genuine issues of material fact with respect to Lottinger's claims, and Shell is entitled to judgment as a matter of law.

IT IS SO ORDERED.